**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**MACKY BLUFFS DEVELOPMENT
CORPORATION,**

        **Plaintiff,**

**v.**                                                        Case No. 3:06cv397/MCR/EMT

**ADVANCE CONSTRUCTION
SERVICES, INC.,**

        **Defendant.**
_____/

**O R D E R**

This case involves a dispute over construction work performed by defendant Advance Construction Services, Inc. ("Advance") for plaintiff Macky Bluffs Development Corporation ("Macky Bluffs"). Macky Bluffs alleges in its two-count complaint that Advance breached the parties' agreement by failing to perform the scope of the construction work contemplated by the parties in a reasonable manner and that Advance made fraudulent misrepresentations and/or omissions concerning the work it did perform. The court conducted a three-day bench trial in February 2008. Having considered the evidence and testimony presented at trial, as well as the parties' written closing arguments and proposed findings of fact and conclusions of law, the court concludes that final judgment should be entered in favor of Advance.

**Federal Rule of Civil Procedure 52**

When conducting a bench trial under Rule 52(c), the court not only determines matters of law but it also decides matters of fact. See United States v. $242.484.00, 389 F.3d 1149, 1172 (11th Cir. 2004). As the trier of fact, the court may resolve conflicts in the evidence and make credibility determinations. See Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1504 (11th Cir. 1993); Stearns v. Beckman Instruments, Inc., 737 F.2d 1565, 1568 (Fed. Cir. 1984). Rule 52(a) requires a district court sitting without a jury to make findings of fact and conclusions of law and to do so with enough specificity for a reviewing court to identify those factual findings upon which the court's legal conclusions are based. See Feazell v. Tropicana Products, Inc., 819 F.2d 1036, 1041-42 (11th Cir. 1987). The rule does not, however, require the court to make a finding on every contention raised by the parties. Id. The court should "evaluate the evidence without making special inferences in the plaintiff's favor . . . and [should] resolve the case on the basis of preponderance of the evidence." Emerson Electric Co. v. Farmer, 427 F.2d 1082, 1086 (5th Cir. 1970)[1]; Grant v. Bullock Board of Education, 895 F.Supp. 1506, 1509 (M.D.Ala. 1995).

In accordance with the requirements of Rule 52, the court enters the following findings of fact and conclusions of law.

**Findings of Fact**

In the late 1990s, Macky Bluffs began developing a residential subdivision project ("the subdivision" or "the Macky Bluffs subdivision") in Pensacola, Florida. Matthew Stevens ("Stevens") was Macky Bluffs' principal representative. Macky Bluffs retained Jehle Engineering, Inc. ("Jehle Engineering") to design the proposed subdivision; Macky Bluffs also expected Jehle Engineering to act as the developer's field representative during the construction of the subdivision improvements, overseeing the work of the contractors hired to complete the various projects. The principal representatives for Jehle Engineering

---

[1] Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

involved in the project were Don Jehle ("Jehle") and David Ramos ("Ramos"). Jehle served as consulting engineer and was typically on-site on a monthly basis. Ramos served as site inspector and was responsible for supervising contractors working on the development. Ramos was typically on-site on a weekly basis.

On or about July 1, 1998, Macky Bluffs hired Advance to perform various infrastructure work for the development, including the construction of a retention pond. Advance's two principal representatives for the Macky Bluffs subdivision project were Bob Najor and Lew Najor. Bob Najor is the president and major stockholder of Advance; Lew Najor is vice-president of Advance and responsible for the company's field operations. In the course of Advance's construction of the retention pond, Stevens asked the Najors to redesign the pond because problems associated with the original design affected the saleability of three adjacent lots. Bob Najor proposed to steepen the slope of one of the pond's walls, which would allow the lots to be sold without decreasing the capacity of the retention pond. He further proposed to use a subgrade of soil for the job and then a layer of rip-rap and silt fence to prevent erosion.[2] Stevens agreed to this proposed modification of the wall.

After Advance completed the modifications to the retention pond, a portion of the modified wall failed. The failure of the wall was caused by a subterranean sand vein which allowed water to migrate from a retention pond on an adjoining property into the soil beneath Macky Bluffs' modified retention pond wall, causing the soil on the Macky Bluff's property to become saturated and lose its structural integrity. One major failure of the wall occurred, followed by a number of smaller failures which caused even more material to shift to the bottom of the pond. In total, a significant amount of debris – including rip-rap, saturated soil, silt fence, and a small amount of sod that had been planted at the top of the retention pond – slid into the pond. Some roots from trees planted near the retention pond and parts of a chain-link fence which surrounded the retention pond may also have been

---

[2] Rip-rap is the material used to create the sustaining wall on an embankment slope to prevent erosion. Merriam-Webster's Collegiate Dictionary 1075 (11th ed. 2003). It is normally composed of stones or chunks of concrete. Id. In this case, the rip-rap was composed of "Type II Alabama rock." Silt fence is a woven, black, fibrous material used as a sediment barrier.

Case No. 3:06cv397/MCR/EMT

part of the debris.

Following the collapse of the wall, pursuant to a written change order Macky Bluffs and Advance agreed that Advance would remove debris from the pond and rebuild the collapsed wall. The change order was a unit-cost proposal based on material volume estimates for each of the listed tasks. Two of these tasks required Advance to "[h]aul-off existing eroded material" and "[h]aul-in suitable backfill material." The change order further provided that Advance was not responsible for work not listed on the change order. During Advance's repair work Jehle kept track of the amount of material extracted from the pond and hauled off and the amount of material hauled in. At the completion of the project, Jehle revised the number of cubic yards listed on the change order to reflect the actual quantity of material that Advanced had moved.

In performing its work under the change order Advance stockpiled the extracted material from the pond on an area which was later designated as Lot 8, Block C ("Lot 8"),[3] a nearby lot which was vacant at the time.[4] Advance then went through the stockpiled material and salvaged whatever rip-rap it could to rebuild the wall. Advance also excavated additional backfill material from Lot 8 to complete the wall. The stockpiled material Advance could not use for the repair work was left on Lot 8 after being dried, spread, and compacted in eight (8) inch lifts. The repair work was completed by July 2000.[5]

After rebuilding the failed retention pond wall, Macky Bluffs had continuing discussions with Advance about its use of Lot 8 in connection with the work. On September 27, 2000, Jehle drafted a letter to Bob Najor in which he stated that there were

---

[3] For the sake of clarity, the court refers to this area as Lot 8 even though it was not so designated at the time the retention pond was being repaired. The property eventually designated as Lot 8 was located at the intersection of two roads in the subdivision and was approximately a quarter of a mile from the retention pond.

[4] Advance's work to repair the retention pond was directed by Lew Najor, who was typically on-site three to four times a week. Bob Najor was out of town during the repair of the retention pond.

[5] There is some disagreement about how long it took Advance to repair the retention pond wall. Bob Najor estimated that the repairs took between two and three months, Lew Najor testified that the repairs took less than one month, and Ramos testified that the repairs took between thirty and forty-five days. In any event, it appears that the repairs were completed by July 2000.

a few matters remaining to be resolved before final payment could be issued to Advance. One of these items was "[c]onfirmation on the disposal of the waste materials taken from the retention basin when the embankment was washed out. It is our understanding that these materials may have been buried on [Lot 8, Block C].[6] If so, we need to make sure that the stability of this lot has not been adversely affected."[7] (Def.'s Ex. 1). The nature of Advance's response to this letter not entirely clear, but Bob Najor testified that Advance hired Pensacola Testing Lab to test the compaction of Lot 8 and sent the results to Jehle.[8] Also, in a letter dated February 5, 2002, Lew Najor responded to a request from Macky Bluffs for clarification of Advance's use of Lot 8, stating "[t]his letter serves as confirmation that no construction debris was disposed of on Lot 8, Phase II of Mackey [sic] Bluffs Subdivision. The lot was backfilled with material from the pond when the west slope blew-out due to saturation. The material was only wet. It was hauled, spread and compacted. This was done in an effort to keep the cost of the change order (Slope Fix with Underdrain) down by not hauling the material off site." (Pl.'s Ex. 4).

In 2004, nearly four years after Advance had completed the repairs of the retention pond wall, Macky Bluffs prepared Lot 8 for sale. Stevens was concerned that Macky Bluffs would need to disclose to potential buyers that Lot 8 had been disturbed and that he did not have full knowledge of what might be buried on Lot 8. Macky Bluffs thus hired Daniel Hayes ("Hayes"), Senior Engineering Technician for Professional Service Industries, Inc. ("PSI"), to evaluate Lot 8. Hayes attempted to perform hand auger borings on the lot in late May or early June 2004 but was unable to complete the borings because impenetrable materials were encountered beneath the surface. Hayes recommended that test pits be dug to better define the horizontal and vertical extent of the debris present.

---

[6] Jehle's letter actually refers to "Lot 9, Block D." The parties agree that this reference was a typographical error and should have been "Lot 8, Block C."

[7] Stevens testified that he first became concerned about Lot 8 when he drove by the lot and noticed it had been clear cut and thus potentially had tree stumps buried beneath the surface. Stevens, however, could not recall when this occurred and Jehle's letter of September 27, 2000, does not make any reference to tree stumps or the clearing of Lot 8.

[8] Advance did not introduce these results at trial and thus they have not been admitted as evidence.

Case No. 3:06cv397/MCR/EMT

After receiving the results of PSI's intial tests, Jehle drafted a letter to Lew Najor on June 7, 2004, in which he stated, "attached is a letter regarding some soils testing that was done on Lot 8, Block C, which shows the presence of substantial amounts of debris, concrete, etc. The clearing and filling of this lot has always been of concern, and it appears that the filling involved materials which should have been disposed of offsite." (Pl.'s Ex. 9). On June 29, 2004, Lew Najor responded to Jehle by letter stating, "the material used to backfill lot eight (8) has been discussed several times. If you recall, prior to the first addition of underdrain when we encountered slope failure, the material (which included rip-rap) was hauled to that lot and stockpiled. The stockpiled rock was reused on the retention pond slope. The material that remained left questions about the backfill being saturated. It was dried, rolled and tested for compaction. There possibly could have been a few rocks left in the material prior to the spreading and compaction. Once the lot was compacted, it was tested by Pensacola Testing Lab." (Pl.'s Ex. 10).

In August 2004, Macky Bluffs hired PSI to perform a number of test pits on Lot 8. These pits revealed debris including asphalt, large rocks, plastics, roots, and organics to depths ranging from one to six feet below the existing grade of the lot. Based on the materials found in these test pits, PSI recommended that the debris be removed from beneath potential building and concrete slab sites such as driveways, porch slabs, and outbuildings and that the lot be backfilled with readily compactable soil. Macky Bluffs agreed with PSI's recommendations and thus hired S & M, Inc. ("S & M") to excavate Lot 8 and refill it with acceptable materials.[9] Oscar Pittman ("Pittman") was Macky Bluffs' principal representative during the course of PSI's testing and S & M's excavation of Lot 8. According to Pittman, prior to excavation of the lot, he observed rip-rap and pieces of concrete on the lot's surface.

From March 2005 through May 2005, S & M excavated Lot 8 and backfilled it with acceptable materials. The length and width of the excavation extended to two feet beyond the set-back lines. The depth of the excavation depended on the suitability of the soils in

---

[9] S & M's principal representatives on this project were Rick Scott Mullen ("Mullen") and Eric Singerhouse.

Case No. 3:06cv397/MCR/EMT

each section of the lot, with the deepest excavation going down at least eight feet below grade. During the excavation of Lot 8, S & M uncovered rip-rap, silt-fence, tree stumps, logs, "muck" (decomposing organic materials), plastic, concrete, and metals.[10] The extracted material was taken to several different construction and demolition ("C & D") pits. Ramos and Pittman observed similar materials being removed from the lot. Based on the materials found buried on Lot 8, Hayes, Ramos, and Pittman testified that it would be inadvisable to build a residence on the lot because of potential settlement.

Macky Bluffs contends that Advance agreed to remove from Lot 8 any materials it could not use in rebuilding the failed retention wall and dispose of them off-site and then restore Lot 8 in a commercially reasonable manner. Macky Bluffs claims that instead of doing this Advance buried all of the unusable materials from the retention pond on Lot 8, including those materials Macky Bluffs uncovered when it excavated the lot in 2005, and as a result the property is not marketable. Advance concedes that the materials it spread, dried, and compacted on Lot 8 were the same materials it extracted from the retention pond, including unused rip-rap, saturated soil from the failed wall, small amounts of sod, some silt fence, and possibly some roots and chain link fence. Advance insists that the parties fully understood and intended that these materials would be buried on Lot 8 so as to minimize the cost to Macky Bluffs in having that material hauled off-site. Advance, however, denies burying any materials on Lot 8 that were not extracted from the retention pond.

The events outlined above present two issues of disputed fact that the court must resolve. First, the court must decide whether the parties intended that the unsalvageable materials be left on Lot 8 or taken off-site to a commercial C & D pit or landfill. Second, the court must decide whether Advance buried other materials on Lot 8, beyond those materials which Advance extracted from the retention pond, including tree stumps, logs, muck, plastics, concrete, and metals. There was conflicting testimony at trial on both

---

[10] In his deposition, which was admitted at trial, Mullen testified that S & M uncovered an "inordinate amount of organic material" buried on Lot 8, including a tree trunk which was twelve to fourteen inches in diameter and eight to twelve feet long buried at approximately six to eight feet below grade.

Case No. 3:06cv397/MCR/EMT

issues.

With respect to the first issue, Bob Najor testified that after the collapse of the retention pond wall he discussed various options for repairing the wall directly with Stevens. Najor testified that Stevens wanted to minimize costs as much as possible because Macky Bluffs had already paid Advance to construct the wall once, and the repair work could potentially require Macky Bluffs to expend the same amount again. Najor testified that he and Stevens ultimately agreed that Advance would extract the material that had slid to the bottom of the retention pond and stockpile it on Lot 8. Advance would then go through the stockpiled material and salvage whatever material it could to rebuild the wall. Advance would also excavate backfill soil from Lot 8 as necessary to rebuild the wall, thus saving Macky Bluffs the cost of acquiring backfill material from an off-site commercial supplier. Advance would then fill in the void left on Lot 8 with the remaining, unsalvageable material. Stevens' testimony differed in many material respects from Najors', most notably that Advance agreed to haul all of the debris from Lot 8 off-site and that Advance agreed to restore Lot 8 in a commercially reasonable manner.

Resolution of this disputed factual issue requires the court to make a witness credibility determination. Because Bob Najor's memory of the parties' agreement and the pertinent events surrounding the project was consistent and clear while Stevens' recollection was vague and at times internally inconsistent, the court credits Bob Najor's testimony rather than Stevens'. First, Stevens' testimony concerning the relevant parties to the agreement varied significantly. At one point in his testimony Stevens stated that he had conversations with the Najors about the repair of the pond but at another point he stated that all such discussions were solely between the Najors and Jehle, with Stevens minimally involved in determining the scope of Advance's work.[11] Also, Stevens' testimony concerning the parties' agreement on the condition in which Advance was to leave Lot 8 was inconsistent. Stevens testified that he expected Advance to haul off all of the

---

[11] The court notes that Macky Bluffs did not call Jehle as a witness or seek to admit any part of his deposition testimony, even though Stevens testified at times that Jehle was his "quarterback," determining and directing all of Advance's work concerning the repair of the retention pond.

Case No. 3:06cv397/MCR/EMT

unsalvageable materials remaining on Lot 8 but he also stated that it would have been sufficient if Advance had done as they said and spread, dried, and compacted the unsalvageable materials.  During his testimony Stevens also stated that he expected Advance would bury some of the unused rip-rap on Lot 8.  Additionally, Stevens' testimony changed with respect to the reason why he understood that Advance was required to dispose of the unsalvageable materials off-site changed.  Stevens at first admitted that his understanding of the parties' agreement on this issue was not based on any specific conversation with either of the Najors, but rather on his experience with the common practice in the profession.  Later, however, Stevens stated that his understanding was based on the original drawings prepared in connection with the parties' initial agreement.

      Other evidence in the case is consistent with Bob Najor's testimony that the parties intended that Advance would undercut Lot 8 to obtain additional backfill material and then fill in the void created with remaining, unsalvageable materials from the pond.  First, Najor's uncontradicted testimony showed that the cost of hauling the unsalvageable material to a C & D pit or landfill would have been substantially greater than the price agreed to in the change order.  Similarly, Najor testified that the unit cost for hauling-in suitable backfill material would have been substantially greater if Advance had agreed to purchase the material from a commercial supplier rather than excavating the material from Lot 8.  Najor testified Advance would never have agreed to haul the unsalvageable material off-site and purchase additional filler material from a commercial supplier for the amounts stated in the change order.  Najor's testimony in this regard is undisputed and thus lends support to Advance's position that the parties agreed and understood that the unsalvageable materials would be left on Lot 8 and not disposed of off-site.  As further support for this conclusion, the evidence at trial consistently showed that Stevens' principal aim in deciding how to repair the retention pond was to minimize costs as much as possible.  Bob Najor in fact testified that he would not have proposed doing in the work in the procedure agreed to if not for Stevens' desire to save money.  As just discussed, it is undisputed that the procedure the parties agreed to for repair of the retention wall minimized Macky Bluffs' job-related expenses.  It is also undisputed that during the course of Advance's work on Lot

8, no representative of Jehle Engineering or Macky Bluffs ever advised Advance that the work it was doing and/or the procedure it was following was not in compliance with the developer's plans. Also, Advance was never told that it needed to remove any of the unsalvageable materials from Lot 8. Finally, Lew and Bob Najor's uncontradicted testimony showed that the parties agreed that all of Advance's costs in connection with the repair of the retention wall would be passed on to Macky Bluffs. Thus, it made no difference to Advance whether the unsalvageable materials were left on Lot 8 or disposed of off-site. Advance had no incentive to surreptitiously bury the unsalvageable materials on Lot 8, as opposed to Macky Bluffs which stood to save expense by this procedure.[12] For all of these reasons, the court finds that the parties intended that unsalvageable materials would be left on Lot 8 rather than be taken off-site to a commercial C & D pit or landfill.

The second issue of fact for the court to resolve is whether in 2000 Advance buried materials on Lot 8 beyond those it extracted from the retention pond. Both Bob and Lew Najors testified that the only materials left on Lot 8 were those materials extracted from the retention pond which did not include any plastics, metals, tree stumps, logs, pressure-treated wood, or muck.[13] Both men further testified that if Advance had uncovered tree

---

[12] Macky Bluffs argues that Advance's actions to restore Lot 8 show that the parties intended that Lot 8 would be restored in a commercially reasonable manner. Although the court recognizes that it is "[a] well-established rule of contract construction . . . that the actions of the parties may be considered as a means of determining their intentions if the language does not clearly disclose their purpose" (see Mesch v. Berry, 528 So.2d 1250, 1251 (Fla. 1st DCA 1988)), the greater weight of the evidence does not support Macky Bluff's contention. The evidence shows that the change order was negotiated by Stevens and Bob Najor, while the actual remedial work was directed by Lew Najor. Lew Najor's agreement to spread, dry, and compact the unsalvageable materials on Lot 8 without additional compensation does not change the original agreement between Stevens and Bob Najor. Bob Najor testified that he did not learn that the unsalvageable materials had been spread, dried, and compacted until a year after the repair of the pond was complete and that this was beyond the scope of work Advance agreed to perform in the change order. Finally, even if Advance's actions to spread, dry, and compact the unsalvageable materials could be considered as evidence of the parties' intent, these actions are consistent with Bob Najor's testimony that he and Stevens agreed that the unsalvageable materials from the pond would be left on Lot 8 and not disposed of off-site.

[13] Ramos testified that the material in the bottom of the retention pond after the wall failure constituted "muck." Ramos' testified, however, from a picture at trial and not from any personal evaluation of the material. In response, Bob Najor conceded that the materials left on Lot 8 would have included small amounts of sod and possibly some roots. He clarified, however, that these small amounts of organic materials could not be classified as "muck."

Case No. 3:06cv397/MCR/EMT

stumps or logs during the process of spreading, drying, and compacting the unsalvageable material on Lot 8, it would have removed and disposed of these items separately. Lew Najor also testified that Advance would not have been able to spread, dry, and compact the unsalvageable material in eight inch lifts if it had encountered tree stumps and logs of the size later found buried on the lot.[14]

The evidence presented at trial also showed that the site where the Macky Bluffs subdivision is now located had been used for dumping debris in years past. Both Najors testified at trial and Jehle testified in his deposition that substantial amounts of debris and trash existed on the Macky Bluffs site prior to development of the subdivision including, as Bob Najor testified, an entire landfill site. Stevens conceded at trial that the county had dumped concrete in the subdivision and that other dumpers had unloaded garbage on the site, including some concrete slab.

The evidence at trial also showed that the area eventually designated as Lot 8 had been used as a storage and disposal site throughout the development of the subdivision. Bob Najor testified that Lot 8 had been cleared during the early stages of the subdivision's development and had previously been used as a staging area. Bob Najor also testified that Advance had previously used Lot 8 as a source of extra soil and fill material. Further, Stevens testified that at one point during the subdivision's development, he became aware that concrete trucks were washing out their wheelbarrows on Lot 8.[15] Finally, the evidence at trial showed that Advance used only a portion of Lot 8 to spread, dry, and compact the unsalvageable materials and only excavated down approximately three to five feet below the existing grade of the lot. Lew Najor further testified that portions of Lot 8 were already above grade and thus Advance's excavations merely brought these areas to grade.

Macky Bluffs presented no direct evidence that Advance buried any materials on Lot 8 beyond that which Advance extracted from the retention pond. Not one witness testified that he had been present on Lot 8 during the repair of the retention pond and witnessed

---

[14] Lew Najor's testimony that Advance compacted the material in eight inch lifts is uncontradicted.

[15] Stevens testified that he put a stop to this practice.

Case No. 3:06cv397/MCR/EMT

Advance stockpiling, excavating, or burying the improper materials discussed at trial on Lot 8 in 2000.[16] Instead, Macky Bluffs relies almost solely on the inference that, because these additional materials were excavated from Lot 8 in 2005 along with the materials which Advance admits it buried on the lot in 2000, Advance must have also buried these additional materials.[17] For the reasons previously discussed, including that approximately five years elapsed between the time Advance completed the repair work in 2000 and the time S & M excavated Lot 8 in 2005, the court rejects this argument. Further, Macky Bluffs did not present any evidence proving that the improper materials were found in the same part of Lot 8 which Advance used to spread, dry, and compact the unsalvageable materials from the pond. The court was not presented with any evidence from which it could determine where the objectionable items were found in relation to where Advance buried the unsalvageable materials from the pond, both in terms of the location of the materials on Lot 8 and the depth of the materials.[18] Accordingly, the court finds that Advance did not bury materials on Lot 8 beyond those it extracted from the retention pond.

## **Conclusions of Law**

### *Count 1: Breach of Contract*

Macky Bluffs contends that its contract with Advance required Advance to haul away any unsalvageable materials from Lot 8 and that Advance breached its contract by burying

---

[16] Lew Najor was the only person who testified to being present on Lot 8 during the repair of the retention pond, and he testified he did not observe any of these improper materials being buried on Lot 8.

[17] The court notes that Macky Bluffs also presented evidence, in the form of Stevens' testimony, that to his knowledge no other contractors were using Lot 8 during the repair of the retention pond. Stevens' testimony, however, is insufficient to prove that Advance buried these improper materials on the lot as Stevens' was relying simply on his own belief and not on any direct evidence. Further, it is not clear when the improper materials were buried on the lot. These materials could have been buried long before – or after – Advance performed its work to repair the retention pond.

[18] The importance of such evidence is shown by Rick Mullen's deposition testimony that he uncovered a tree trunk which was twelve to fourteen inches in diameter and between eight and twelve feet long buried approximately six to eight feet below grade. As noted, Lew Najor's uncontradicted testimony was that the materials left by Advance were at most five feet below the existing grade of the property, which was in turn above street grade. Based on this testimony, Advance could not have buried the large tree trunk which Mullen found. The court further notes that Macky Bluffs conceded at trial that it did not possess any video footage, photographs, or digital pictures depicting the extracted, improper materials removed from Lot 8. There are also no records of the amount, nature, or location of the improper materials.

Case No. 3:06cv397/MCR/EMT

inappropriate materials on Lot 8 and not restoring Lot 8 in a commercially reasonable manner. In response, Advance contends that the parties agreed that the unsalvageable materials from the pond would be left on Lot 8 and thus Advance acted in conformity with the contract when it left the unsalvageable materials on Lot 8. Advance further contends that it did not breach its contract with Macky Bluffs by burying any additional materials on Lot 8.

To prevail on a breach of contract claim, a plaintiff must prove (1) the existence of a contract, (2) a material breach of the contract, and (3) damages resulting from the breach. Carpenter Contractors of America, Inc. v. Fastener Corp. of America, Inc., 611 So.2d 564 (Fla. 4th DCA 1992) (citing Knowles v. C.I.T. Corp., 346 So.2d 1042 (Fla. 1st DCA 1977)). It is the plaintiff's burden to prove each of these elements by a preponderance of the evidence.[19] Id.

Under Florida law, the interpretation of a contract is a matter of law for the court's determination, "so long as the terms of the contract are unambiguous." Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc., 140 F.3d 898, 905 (11th Cir. 1998) (citing Moore v. Morris, 475 So.2d 666, 668 (Fla. 1985)). The existence of an ambiguity in a contract is also a matter of law. Centennial Mortgage, Inc. v. SG/SC, Ltd., 772 So.2d 564, 565-66 (Fla. 1st DCA 2000). There are two types of ambiguities that can exist in a contract: patent and latent. Saenz v. Campos, 967 So.2d 1114, 1117 (Fla. 4th DCA 2007). A patent ambiguity is one which appears on the face of the contract. Id. A latent ambiguity, on the other hand, exists "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." Mac-Gray Servs., Inc. v. Savannah Assocs. of Sarasota, LLC, 915 So.2d 657, 659 (Fla. 2d DCA

---

[19] A contract is not enforceable unless "there has actually been a meeting of the minds of the parties upon definite terms and conditions which include the essential elements of a valid contract." Leopold v. Kimball Hill Homes Florida, Inc., 842 So.2d 133, 136 (Fla. 2d DCA 2003) (quoting Mehler v. Huston, 57 So.2d 836, 837 (Fla. 1952) (internal quotation marks omitted)). In determining whether there has been a meeting of the minds, courts look not to "the agreement of two minds in one intention, but on the agreement of two sets of external signs-not on the parties having meant the same thing but on their having said the same thing." Id. (quoting Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 302 So.2d 404, 407 (Fla.1974) (internal quotation marks omitted)).

Case No. 3:06cv397/MCR/EMT

2005) (quoting Ace Elec. Supply Co. v. Terra Nova Elec., Inc., 288 So.2d 544, 547 (Fla. 1st DCA 1974) (internal quotation marks omitted)). If the ambiguity is patent, then parole evidence cannot be used to clarify the parties' intent. Id. (citing Crown Mgmt. Corp. v. Goodman, 452 So.2d 49, 52 (Fla. 2d DCA 1984)). If the court finds, however, that there is a latent ambiguity in the contract, then parol evidence must be heard in order to determine the parties' intent. Id. (quoting RX Solutions, Inc. v. Express Pharmacy Servs., Inc., 746 So.2d 475, 476 (Fla. 2d DCA 1999)). The parties' intent is a question of fact for the trier of fact to decide. Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of City of Detroit, 50 F.3d 908, 919 (11th Cir. 1995) (citing Fecteau v. Southeast Bank, N.A., 585 So.2d 1005, 1007 (Fla. 4th DCA 1991)).

The change order in this case states that Advance will "[h]aul-off existing eroded material," but does not specify to where. Both of the parties' interpretations of the change order are plausible and the ambiguity does not appear on the face of the change order, but rather arises from an extraneous circumstance. Thus a latent ambiguity exists in the change order and the court properly heard parol evidence to determine the parties' intent at the time they entered into the agreement. The court has found as a matter of fact that the parties intended that unsalvageable materials would be left on Lot 8. Accordingly, Advance did not breach its contract with Macky Bluffs by leaving the unsalvageable materials from the pond on Lot 8. The court has also determined from the greater weight of the evidence that Advance did not bury materials on Lot 8 beyond those which it extracted from the pond. Accordingly, Macky Bluffs has not sustained its burden to prove by a preponderance of the evidence that Advance breached its contract with Macky Bluffs by burying materials on Lot 8 such as plastics, metals, tree stumps, logs, pressure-treated wood, and muck. [20]

---

[20] The court need not resolve whether any of the material left on Lot 8 was technically "muck" because it has determined that the parties understood all materials taken from the pond would be disposed of on the lot.

Case No. 3:06cv397/MCR/EMT

*Count 2: Fraudulent Misrepresentation*

In support of its claim for fraudulent misrepresentation, Macky Bluffs relies on Advance's representations in Lew Najor's letter of February 5, 2002.[21]

A claim of fraudulent misrepresentation requires proof that (1) the defendant made a false statement concerning a material fact; (2) the defendant knew the representation was false; (3) the defendant intended the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation.  Webb v. Kirkland, 899 So.2d 344 (Fla. 4th DCA 2005) (citation omitted).  The plaintiff has the burden to prove each of these elements by a preponderance or "greater weight" of the evidence. Passaat, Ltd. v. Bettis, 654 So.2d 980, 981 (Fla. 4th DCA 1995) (citing Wieczoreck v. H & H Builders, Inc., 475 So.2d 227 (Fla. 1985)).

Macky Bluffs' claim for fraudulent misrepresentation based on Lew Najor's letter fails for two reasons.  First, there is no false statement in the letter.  Lew Najor stated in the letter that Advance left material from the pond on Lot 8 but not any construction debris.  This has been Advance's position all along and, again, the court has determined that the evidence is insufficient to show that Advance buried any other materials on Lot 8 beyond those which it extracted from the pond.  Second, even if the letter contained a false statement, there is no evidence that Macky Bluffs relied on that statement to its detriment.  In fact, from the evidence it is clear that Macky Bluffs did not believe Lew Najor's representation and thus hired PSI to perform test pits to determine what materials were buried on Lot 8.[22]  Moreover, Stevens conceded that Macky Bluffs did not incur any out-of-pocket expenses based on Lew Najor's representation, and there was no evidence the letter was disclosed by Macky Bluffs to any potential purchasers of Lot 8.

---

[21] As recited previously, in that communication Najor stated, "[t]his letter serves as confirmation that no construction debris was disposed of on Lot 8, Phase II of Mackey [sic] Bluffs Subdivision.  The lot was backfilled with material from the pond when the west slope blew-out due to saturation.  The material was only wet.  It was hauled, spread and compacted.  This was done in an effort to keep the cost of the change order (Slope Fix with Underdrain) down by not hauling the material off site." (Pl.'s Exh. 4).

[22] The court also notes that Jehle stated in his deposition that it was not a secret that Advance may have used Lot 8 as either a staging ground or possibly a disposal area for some of the extracted materials from the pond.

Case No. 3:06cv397/MCR/EMT

Applying the law to the facts of this case, the court finds that Macky Bluffs has not sustained its burden of proof on either claim, and therefore final judgment should be entered in favor of Advance. Accordingly, it is hereby ordered and adjudged that final judgment is entered in favor of defendant as to each claim presented, with taxable costs assessed against plaintiff.

**DONE and ORDERED** this 26th day of September, 2008.

*s/ M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**